**UNION OIL COMPANY OF CALIFOR-NIA and Beacon Oil Company, Petitioners,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY and Lee M. Thomas, Administrator, Respondents.**

No. 85–1326.

United States Court of Appeals, District of Columbia Circuit.

Argued April 21, 1986.

Decided June 19, 1987.

Patrick M. Raher, with whom Allen R. Snyder, David J. Hayes, Julie E. Stumpe, Washington, D.C., and Timothy R. Thomas were on the brief, for petitioners.

Bonnie A. Sullivan, Atty., Dept. of Justice, with whom Francis S. Blake, Gen. Counsel, Gerald K. Gleason, Asst. Gen. Counsel, and Ralph J. Colleli, E.P.A., Atty., Washington, D.C., were on the brief, for respondents.

Before BORK* and SILBERMAN, Circuit Judges, and WRIGHT, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Since 1973, the Environmental Protection Agency (EPA) has exercised its discretionary authority under the Clean Air Act, 42 U.S.C. § 7401 *et seq.* (1982), to regulate the lead content of gasoline. In 1985, EPA promulgated new fuel additive regulations that significantly reduced the amount of lead permitted in gasoline. These regulations established a descending lead content standard that sharply increased in stringency between March 1985 and January 1986. To ease the burden of the standard on gasoline producers, EPA also promulgated supplementary regulations allowing producers who could bring their lead content *below* that required by law to "bank" those lead credits and use them later as the lead content standards became progressively stricter.

Petitioners Union Oil Company of California and Beacon Oil Company are California-based gasoline producers. They challenge one aspect of the lead banking scheme—the "state standard limitation"— which precludes gasoline producers from banking lead credits for reductions due solely to compliance with a state standard more stringent than the applicable federal standard. California is the only state with a separate lead standard, and its strict regulation of lead content applies to all gasoline sold in California, wherever produced.[1] Petitioners are concerned that the

---

* Replacing *Circuit Judge* (now Justice) SCALIA, who was a member of the panel which heard oral argument in this case, but did not participate in the decision.

1. There seems to be some confusion in the briefs regarding who precisely is affected by the California lead regulation. Both parties at different times refer to the regulated entities as California "producers," "refiners," or "sellers" of gasoline. The California statute makes clear, however, that it regulates only gasoline *sold* in California from any source. *See* Cal.Admin. Code, title 13 § 2253.2(d) (1984). Thus, the

state standard limitation unfairly discriminates against California gasoline sellers and puts them at a competitive disadvantage vis-a-vis those who sell out of state.

Before us, petitioners maintain that the lead banking regulation was promulgated in violation of the Clean Air Act's procedural norms, that the regulation is substantively flawed because its differential treatment of California and other gasoline sellers is arbitrary and capricious, and that the regulation violates petitioners' constitutional rights to due process and equal protection while encroaching on state prerogatives in contravention of the Tenth Amendment. After review of the rulemaking process in this case, we find several procedural flaws, but conclude that they are not grounds for reversal. Petitioners' substantive objections under both the Clean Air Act and the Constitution also fail to persuade us. We think that EPA's lead banking regulation with its state standard limitation is reasonable and must stand.

## I.

Sections 211(c)(1)(A) and 211(c)(1)(B) of the Clean Air Act, 42 U.S.C. §§ 7545(c)(1)(A), (B), give EPA broad discretion to "control or prohibit the manufacture ... or sale of any fuel or fuel additive" used in motor vehicles in order to protect the public health or welfare or prevent impairment of emission control devices. EPA has exercised this discretion since 1973 to regulate the lead content of gasoline. Although lead is a cost-effective way to raise the octane content of gasoline, the combustion of leaded gasoline correlates with elevated blood lead levels, which in turn may cause serious health effects, especially in children.

On August 2, 1984, EPA proposed amendments to its existing fuel additive regulations that would significantly accelerate the reduction in the allowable lead content of gasoline. See 49 Fed.Reg. 31,032 (Aug. 1, 1984). After an extended notice and comment period, EPA issued a final rule on March 7, 1985. This regulation required a reduction in lead levels from a standard of 1.10 grams per leaded gallon ("gplg") first to an interim standard of 0.50 effective July 1, 1985, and then a final standard of 0.10 gplg effective January 1, 1986. See 50 Fed.Reg. 9,386 (March 7, 1985). EPA analyzed the relative health benefits and economic costs of greater lead regulation and concluded that its new lead standards "will result in significantly greater health benefits ... [and] are feasible for the industry as a whole." Id. at 9,388.

While it was considering the lead content rule, EPA proposed in January 1985 a supplemental rule designed to ease the difficulty some producers might have in meeting the 0.10 gplg standard on schedule. This proposal permitted gasoline producers who voluntarily reduced their 1985 lead usage below the maximum allowable under the standards then applicable to "bank" lead credits equal to the amount of lead usage foregone in 1985. Producers could then use those credits during the period from April 1985 to December 1987 to reduce the impact of the progressively stricter lead standards. The proposal allowed gasoline producers to use their banked credits themselves or sell them to other producers consistent with reporting requirements and state standards for gasoline lead content not preempted by § 211(c)(4) of the Clean Air Act. 42 U.S.C. § 7545(c)(4). EPA intended the proposed banking scheme to provide the gasoline industry with "greater flexibility in meeting the more stringent lead in gasoline standards expected to be promulgated in 1985." 50 Fed.Reg. 718 (Jan. 4, 1985). But EPA made clear that the proposed banking rule would not "affect[ ] the total reductions in lead usage that would otherwise be required during the 1985–87 period." Id.

EPA's proposed banking rule did not indicate clearly how it would affect gasoline producers in states with lead content standards stricter than those promulgated na-

---

state standard limitation in the federal banking rule likewise affects only those who sell gasoline in California. Throughout this opinion we therefore use the term "seller" to refer to those affected by the state standard limitation, despite varying language used by the parties.

tionally. The proposed rule stated that the banking plan in no way authorized producers to use banked credits to exceed a more stringent state lead standard, but was silent on whether producers could *claim* credits for the difference between the federal standard and a more stringent state standard. This issue affected only California gasoline sellers because California is the only state whose separate stricter lead regulation had not been preempted by federal regulation. *See* Cal.Admin.Code tit. 13, § 2253.2(d) (1984). California limits lead in gasoline to 0.80 gplg, a standard that was 0.30 gplg below the initial federal standard of 1.10 gplg. Once the interim standard of 0.50 gplg took effect, on July 1, 1985, however, the California limit no longer had independent force. Thus, if California gasoline sellers were not permitted to bank credits for the initial difference between the federal and state standards, they would lose credits for 0.30 gplg (1.10 gplg minus 0.80 gplg) during the six months between January 1, 1985 (when banking took effect) and July 1, 1985 (when the federal standard fell below the state standard).

On January 15, 1985, EPA held a public hearing on the lead banking proposal which was attended by representatives from both Union Oil and Beacon Oil. At the hearing, several California gasoline sellers, apparently interpreting the proposal to forbid banking above the California standard, challenged the banking plan as discriminatory to California sellers. The final banking rule, promulgated on April 1, 1985, explicitly limited the credits producers could claim to the difference between their actual lead usage and the maximum allowable under state or federal law, whichever was lower. *See* 40 C.F.R. § 80.-20(c)(1)(ii)(A) (1986). This "state standard limitation," the EPA explained, was retained to prevent an increase in lead usage of approximately 600 metric tons. If that increase in usage took place, it would reduce national monetized benefits (including health benefits) by approximately $20 mil-

lion at a savings to California sellers of only approximately $5 million.[2]

In their appeal to this court, petitioners do not challenge the lead content standards promulgated separately, nor do they challenge the banking scheme as a whole. Rather, they argue only that the state standard limitation on banking unfairly discriminates against California gasoline sellers. After filing their notice of appeal, petitioners requested that EPA provide them with any additional documents, not in the public docket for the lead banking rule, concerning the basis for the state standard limitation. EPA gave Union Oil a copy of an internal staff memorandum dated March 14, 1985 that analyzed the results of allowing California refiners to bank credits for compliance with California law. EPA then placed a copy of the memorandum in the rulemaking docket four days later.

Petitioners argue that EPA violated the procedural rulemaking requirements of the Clean Air Act in two ways. First, EPA failed to provide a comprehensive explanation of the rationale for the state standard limitation in the proposed banking rule. Second, EPA's decision relied on an internal memorandum not docketed until after the notice and comment period was over. Petitioners urge that the banking rule is substantively flawed as well. They maintain that the rule irrationally discriminates against California gasoline sellers and thus is arbitrary, capricious, and an abuse of discretion in violation of the Clean Air Act. The same irrationality, petitioners further contend, violates the due process and equal protection clauses of the Constitution. Finally, petitioners argue that EPA also violated the Tenth Amendment of the Constitution by "virtually coercing" California to raise its lead standard. We address these challenges in turn.

## II.

In 1977, Congress amended the Clean Air Act to provide new procedural requirements for EPA rulemaking under the Act, requirements more stringent than those

---

2. EPA also responded to the critical comments of California sellers offered during the notice and comment period. *See* 50 Fed.Reg. 13,118 (Apr. 1, 1985).

previously applicable under the Administrative Procedure Act (APA). 5 U.S.C. § 551 *et seq.* (1982). The amended Act requires a much more detailed notice of proposed rulemaking than does the APA. This notice must "be accompanied by a statement of its [the proposed rule's] basis and purpose," which *must* include a summary of:

(A) the factual data on which the proposed rule is based;

(B) the methodology used in obtaining the data and in analyzing the data; and

(C) the major legal interpretations and policy considerations underlying the proposed rule.

Clean Air Act § 307(d)(3), 42 U.S.C. § 7607(d)(3) (1982). The Clean Air Act also departs from the APA by requiring EPA to establish a detailed "rulemaking docket" that is open to the public. This docket must provide the entire basis for the final rule and the exclusive record for judicial review. *See* Clean Air Act § 307(d), 42 U.S.C. § 7607(d) (1982). Petitioners maintain that EPA in this case ran afoul of both the notice and docket requirements of the Clean Air Act.

### A. *Notice Requirements*

The notice of proposed rulemaking for the lead banking rule contained extensive data and explanation about the banking scheme in general. *See* 50 Fed.Reg. 718 (Jan. 2, 1985). But petitioners argue that the proposed rule offered little information about the state standard limitation that appeared in the final rule. This lack of information in the proposed rule, claim petitioners, "converted the open rulemaking process into a game of blind man's bluff" so that petitioners "could only guess at the basis for EPA's proposed rule." Had they been aware of EPA's rationale for the state standard limitation, maintain petitioners, they could have addressed directly EPA's justification for its treatment of California gasoline sellers. EPA responds that peti-

tioners received actual notice of the existence and purpose of the state standard limitation at the public hearing on the proposed lead banking rule held on January 15, 1985.[3]

■ Although the representative of Union Oil appeared uncertain at one point as to the agency's intent to limit banking by reference to state standards, *see* Transcript of Lead Phasedown Banking Hearing (Jan. 15, 1985) (Tr.) at 53, J.A. 420, later in the hearing the same representative *assumed* the existence of the state standard limitation by criticizing it. *See* Tr. 60–61, J.A. 427–28. Several other industry representatives, moreover, clearly understood the agency's proposal as including the state standard limitation. *See e.g.,* Tr. 24, 64, J.A. 391, 431 (statements of Chevron and Fletcher Oil representatives). Indeed, the Beacon Oil representative was quite specific on the matter, stating:

> The lead rights banking proposal published by EPA in the January 4th, 1985 Federal Register, is inequitable in its treatment of California's gasoline producers, compared with the rest of the Nation.
>
> This proposal penalizes California refiners who want to bank lead credits, by only allowing them credit for reduction below the California state standard of 0.8 grams per leaded gallon, while producers outside of California receive credit for leaded blends below the 1.1 gram per leaded gallon federal standard between January and July 1, of 1985.

Tr. 71, J.A. 438. He then proceeded to challenge the fairness of this arrangement. Petitioners thus fail to convince us that they did not have actual notice of the state standard limitation as of the January 15, 1985 hearing.

■ Petitioners are similarly unpersuasive in claiming that EPA did not indicate adequately the basis for the state standard limitation. At the hearing, agency repre-

---

**3.** EPA also argues that petitioners received notice of the state standard limitation because it was "self-evident" in the proposed rule and because the proposed rule made reference to purportedly similar provisions of the inter-refinery averaging regulations previously and separately promulgated by EPA. Because we agree with EPA that petitioners received actual notice of the limitation at the January 15th hearing, we need not address these further contentions.

sentatives expressed their concern that failing to take into account the California lead standard in the banking rule would result in an increase in total lead usage. *See* Tr. 74, J.A. 441 (EPA representative noting that eliminating the state standard limitation "would end up allowing more lead to be used under the banking proposal than without a banking proposal").[4] The preamble to the final lead banking rule expressly reiterated that avoiding such an increase in lead usage motivated that state standard restriction on banking. 50 Fed.Reg. at 13,-118.

Our review of the record demonstrates that petitioners received actual notice sufficient to permit them to present their objections to the agency. *See Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 548 (D.C.Cir.1983) (actual notice cures defect in procedural notice); *Sierra Club v. Costle*, 657 F.2d 298, 355, 360 (D.C. Cir.1981) (same). Consequently, we reject petitioners' notice argument.

### B. *Docket Requirements*

Petitioners allege that EPA based the state standard limitation on considerations never revealed during the comment period. These considerations, so petitioners contend, were finally brought to light only in the internal staff memorandum added to the public docket *after* the final rule was promulgated. The two-page memorandum from EPA's Economic Analysis Division offered "some rough calculations of the impact of [allowing California gasoline sellers to bank lead credits up to the federal standard] on the costs and benefits of the rule." It concluded that the costs associated with increased lead banking by California gasoline sellers would make it "difficult to justify" abandoning the state standard limitation. Petitioners argue that their lack of

access to this analysis during the notice and comment period prejudiced their ability to participate in the rulemaking process.

Petitioners are clearly correct that failure to docket data and analysis relied upon in formulating a final rule violates § 307(d)(6)(C) of the Clean Air Act, which states that "[t]he promulgated rule may not be based (in part or whole) on any information or data which has *not* been placed in the docket as of the date of promulgation." 42 U.S.C. § 7607(d)(6)(C) (1982). EPA argues that it did not "base" its final rule on the late-docketed memorandum because the memo simply performed calculations with figures already present in the record. We are not persuaded by this argument. EPA itself referred to the memo as "the basis" for the state standard limitation in its cover letter to petitioners' counsel accompanying the memo. Moreover, the justifications offered for the state standard limitation in the final rule tracked the memo almost exactly, including the figures arrived at for costs and benefits ($20 million in benefits would be foregone if the limitation were abandoned as compared to a cost to California sellers of $5 million if the limitation were retained).

Nonetheless, the Clean Air Act makes clear that we are not to reverse every agency decision in which petitioners correctly identify a procedural error. Section 307(d)(8) established that reversal is justified only if the errors identified were "so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made." 42 U.S.C. § 7607(d)(8) (1982). Although the memo arguably contained information of "central relevance" to the final rule for the same

---

**4.** *See also* Tr. 34, J.A. 401 (EPA representative criticizing industry proposal to ignore state standards on the ground that such an approach would "increase the total allowable lead from what its present levels are"); Tr. 58, J.A. 425 (comment of Natural Resources Defense Council representative supporting EPA's position that failure to take the California lead standard into account would constitute a "back door way of increasing the standard").

Moreover, extensive written comments submitted to EPA after the hearing made clear that California sellers recognized the existence and purpose of the state standard limitation. *See, e.g.*, Written Comments of Beacon Oil Company, Feb. 15, 1985, J.A. 525; Written Comments of Union Oil Company of California, March 21, 1975, J.A. 578.

reasons that it could be said to form "the basis" for that rule, petitioners fail to show the "substantial likelihood" required by the Act that the rule would have been changed.

Petitioners claim that if they had received the memo during the comment period, they could have brought to EPA's attention many purported mistakes in its cost/benefit calculations. This argument misses the central proposition behind the agency's stance, a proposition advanced in the proposed rule, at the hearing, in the final rule, and in the memo itself: EPA wanted to assure that the banking scheme would not increase the amount of lead that would be used in 1985–87 in the absence of banking. It made clear at the hearing that it considered California's more stringent lead regulation as part of the "background" lead usage that the banking plan should not increase. Richard Wilson of EPA, in response to criticism from California sellers at the hearing, drove home EPA's position:

> [B]y providing banking rights ... for California producers between 0.18 [sic] and 1.1, doesn't that increase the total allowable lead from what its present levels are? I understand why that's beneficial to California, maybe to the industry in general, but it has that adverse effect.

Tr. 33, J.A. 401. This point is irrefutable, and it is the first justification offered in the final rule for retaining the state standard limitation. See 50 Fed.Reg. at 13,115 ("This restriction is intended to assure that the banking mechanism per se does not result in increased lead usage."). We do not see how adjustments in the agency's cost/benefit analysis of the potential lead increase could change the fact that an increase *would* occur in the absence of the limitation. EPA expressly rejected the possibility of such an increase from the outset, long before the memo was written. See 50 Fed.Reg. 718 (Jan. 4, 1985).[5] We therefore

conclude that the docketing error correctly identified by petitioners was harmless.

### III.

In addition to their procedural arguments against the promulgation of the lead banking rule, petitioners maintain that the substance of the rule is flawed. They claim that the rule's differential treatment of those who sell gasoline in California is arbitrary, capricious, and an abuse of discretion under § 307(d)(9)(A) of the Clean Air Act and that it violates the Fifth and Tenth Amendments to the Constitution. We think neither the statutory nor the constitutional argument has merit.

Section 307(d)(9)(A) of the Clean Air Act duplicates exactly the APA's prohibition of rulemaking that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A) (1982). The scope of review under the "arbitrary and capricious" standard is well established. We must engage in a "searching and careful" review of the record to establish that the agency's decision is rational and based on consideration of all relevant factors. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). But the ultimate standard of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Once we ensure that the agency's reasoning conforms to "certain minimal standards of rationality," we must uphold the agency's action. *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C.Cir.1976) (*en banc*).

■ We have no doubt that EPA's lead banking rule with its state standard limitation is a rational exercise of the agency's discretion. EPA stated its intention that the lead banking plan *not* increase the lead usage that would otherwise obtain under

---

5. Moreover, even if we were persuaded that modifications in EPA's cost/benefit calculations might have changed the outcome of the rulemaking process, petitioners have not suggested modifications powerful enough to establish a "substantial likelihood" that EPA would have

changed its conclusion. In their reply brief, petitioners estimate industry costs at $14.8 million rather than at the $5 million figure advanced by EPA. This estimate *still* falls below the $20 million of benefits foregone that EPA estimated on the other side of the balance sheet.

its new strict lead content regulations. If EPA considers California's own lead regulation as part of the "background" lead usage that banking should not increase, the state standard limitation is necessary for EPA to achieve its intended "lead-neutral" result. And it seems certainly reasonable for EPA to consider California's lead standard as part of that regulatory background because lead credits are tradable nationally, and thus the lead credits that California sellers would bank to comply with California law would likely appear as increased lead use—above the federal standard—in other parts of the country. *See* Written Comment of Ashland Oil, Inc., February 15, 1985, at 3, J.A. 499 (Sharing EPA's concern, expressed at the hearing, that California not be permitted to "export" air quality problems). EPA's choice to include California's law as part of the regulatory background, if not inevitable, is plainly reasonable. Therefore, the state standard limitation is also reasonable.[6]

Petitioners' due process and equal protection challenges to the banking rule are based on the same claim of "irrationality" as their arbitrary and capricious challenge and thus are similarly without merit. As we noted above in the statutory context, the state standard limitation is clearly designed to promote the public health by maintaining low lead levels in gasoline. We therefore cannot conclude that the limitation is not rationally related to a legitimate state interest as the Fifth Amendment requires. *See City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The limitation does not treat California gasoline sellers differently without reason; it regulates them specially in order to prevent increased lead use under the banking scheme.

Also without merit is the contention that the banking rule runs afoul of the Tenth Amendment by infringing on the sovereign interests of the state of California. The final rule merely notes that "[i]f the state changes its standard to allow more lead usage, California refiners will of course be able to bank up to that level." 50 Fed.Reg. at 13,119. This statement does not, as petitioners maintain, "virtually coerce" the California legislature to change its lead regulation. Rather, EPA simply recognizes that the state standard limitation is necessary in order to give effect to California's law as part of the regulatory background. If anything, EPA is acting to *accommodate* California's law rather than to change it. In any event, no coercive force by the federal government on state processes is even remotely implicated.

Petitioners have correctly identified irregularities in the procedures by which EPA promulgated its lead banking rule. But any failure of notice in the proposed rule as to the existence and purpose of the state standard limitation was cured by petitioners' actual notice at the January 15, 1985 hearing. And EPA's failure to docket its internal staff memorandum before the end of the comment period constituted harmless error because it created no "substantial likelihood" that the result would have been different. Petitioners' substantive challenges to the banking rule under both the Clean Air Act and the Constitution are without merit. The petition for review is therefore denied.

*So ordered.*

---

6. Petitioners maintain that EPA acted arbitrarily and capriciously in failing to consider one commenter's alternative proposal that California sellers be permitted to bank and trade lead rights only within the state of California. This alternative would eliminate the concern about the "exportation" of lead emissions. But EPA clearly *did* address this alternative in its final rule. It noted that "[a] non-California refiner stated that the banking of the 0.30 gplg difference between the federal and state standards

should be allowed only if the ultimate lead usage is confined to California." 50 Fed.Reg. at 13,118. On the same page, EPA concluded that because "there is no guarantee that banked lead usage rights will be used in California[,] ... not promulating such a restriction [the state standard limitation] is a national, not just a California problem." *Id.* EPA did not ignore the proposed alternative; rather, EPA obviously concluded that it would be too difficult to implement and police.