UNITED STATES of America,
Plaintiff–Appellant,
Cross–Appellee,

v.

COASTAL REFINING AND MARKET-ING, INC., Defendant–Appellee,
Cross–Appellant.

No. 89–6056.

United States Court of Appeals,
Fifth Circuit.

Sept. 14, 1990.

Kenneth W. Starr, Sol. Gen., U.S. Dept. of Justice, Michael P. Healy, Robert L. Klarquist, Land & Natural Res. Div., Dept. of Justice, Appellate Sect., C. Carrick Brooke–Davidson, Dept. of Justice, Environmental Enforcement Sect., Washington, D.C., for plaintiff-appellant cross-appellee.

Keith A. Jones, Fulbright & Jaworski, Washington, D.C., Louis S. Zimmerman, J.B. Ruhl, Fulbright & Jaworski, Austin, Tex., for defendant-appellee cross-appellant.

Before REAVLEY, DUHÉ and WIENER, Circuit Judges.

REAVLEY, Circuit Judge:

The United States brought this action against Coastal Refining and Marketing, Inc. ("Coastal"), alleging violations of the Environmental Protection Agency's Clean Air Act regulations with respect to five cargos of imported petroleum product. On cross-motions for summary judgment, the trial court held that Coastal had, in fact, violated the regulations as to four of the five cargos. The trial court, however, refused to impose the $9 million in mandatory penalties sought by the government because the court found that § 211(d) of the Clean Air Act, which establishes the mandatory penalty, is unconstitutional. The government appeals, arguing that § 211(d) is constitutional and that Coastal violated the regulations with respect to the fifth cargo. Coastal cross-appeals, contending that the trial court erred in concluding that it had violated the regulations with respect to four of the cargos. We vacate the judgment and dismiss the suit of the United States.

I.

Section 211(c) of the Clean Air Act authorizes the Administrator of the Environmental Protection Agency ("EPA") to promulgate regulations to

control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive for use in a motor vehicle or motor vehicle engine ... if in the judgment of the Administrator any emission product of such fuel or fuel additive causes, or contributes, to air pollution which may reasonably be anticipated to endanger the public health or welfare....

42 U.S.C. § 7545(c)(1).

For several years the EPA has recognized that lead, which historically was used as an additive to enhance the octane level of gasoline, poses a threat to human health. *See Small Refiner Lead Phase–Down Task Force v. United States EPA,* 705 F.2d 506, 511, 527–31 (D.C.Cir.1983). Accordingly, the EPA has regulated the use of lead as an additive since 1973. *See id.* at 512. In 1985, the Administrator issued regulations under § 211(c) to reduce substantially the lead content in gasoline. *See Union Oil Co. v. U.S. EPA,* 821 F.2d 678, 679 (D.C.Cir.1987). The regulations called for a gradual reduction in lead con-

tent over a period of time.[1] To provide producers and importers with flexibility during the "lead phasedown" period, the EPA regulations permitted those who voluntarily used less lead per gallon than specified in the regulations to "bank" the difference as a "lead usage right." *See* 40 C.F.R. § 80.20(e)(1). These "rights," also referred to as "credits," could then be withdrawn through the end of 1987 to comply with the new, more stringent, standards as they became effective. *Id.* § 80.20(e)(2). These "credits" could also be transferred through the end of 1987, at which time the program ended. *Id.; see also Union Oil Co.*, 821 F.2d at 680.

In order for a producer or importer to generate any "lead usage rights" under the regulatory program, the product produced or imported had to be "gasoline." *See* 40 C.F.R. § 80.20(c)(1)(i), (e)(1)(i)–(ii), (e)(3). "Gasoline" is defined as

> any fuel sold in any State for use in motor vehicles and motor vehicle engines, and commonly or commercially known or sold as gasoline.

*Id.* § 80.2(c) (footnote omitted). Those who participated in the lead banking program were required to make quarterly reports to the EPA in which the product being produced or imported was identified. *See id.* § 80.20(a)(3), (c)(3), (e)(2)(iii), (e)(3)(iv). These reports enabled the EPA to ensure that the total amount of "banked" credits used by the industry did not exceed the maximum allowed under the lead content standard. *See Union Oil Co.*, 821 F.2d at 680.

To give the § 211(c) regulations force, § 211(d) of the Clean Air Act provides that

> [a]ny person who violates ... the regulations prescribed under subsection (c) ... shall forfeit and pay to the United States a civil penalty of $10,000 for each and every day of the continuance of such violation....

42 U.S.C. § 7545(d). Section 211(d) further provides that the Administrator of the EPA

may remit or mitigate the $10,000 per day penalty. *Id.*

## II.

During the first half of 1985, Coastal imported five cargos of petroleum product from Mexico. In its quarterly reports to the EPA, Coastal classified the cargos as "gasoline" and reported the creation of approximately 30 million grams of "lead usage rights" based on this classification.

The United States brought this action against Coastal, contending that the imported product was not "gasoline" and that the "lead usage rights" were, therefore, invalidly created. The government sought $9 million in penalties under § 211(d) ($10,000 per day for 900 days—from the time Coastal classified the product as "gasoline" in the quarterly report on July 15, 1985, until December 31, 1987, the date the banking program ended).

Coastal moved for summary judgment and the United States filed a cross-motion for summary judgment. The trial court granted partial summary judgment on the issue of liability in favor of the United States. With regard to four of the five cargos, the court concluded that Coastal had not imported "gasoline" and, therefore, that the lead credits were not validly created. The court determined that § 211(d) of the Clean Air Act, which imposes the mandatory $10,000 per day penalty for a violation of the regulations issued under § 211(c), was unconstitutional. Consequently, the trial court did not impose any penalty on Coastal. The court also granted partial summary judgment for Coastal, holding that one cargo was "gasoline."

The government appeals the lower court's determination that § 211(d) is unconstitutional and that one of the five cargos was "gasoline" as defined by the regulations. Coastal cross-appeals, claiming that the trial court erred in holding that four of its cargos were not "gasoline."

---

**1.** The lead content of gasoline produced or imported after July 1, 1985, was to be reduced from 1.10 grams of lead per gallon of leaded gasoline to no more than an average level of 0.50 grams of lead per gallon of leaded gasoline.

After December 31, 1985, the lead content could be no more than 0.10 grams of lead per gallon of leaded gasoline on average during any quarter of the calendar year. *See* 40 C.F.R. § 80.20(c)(1) (standards for importers).

## III.

### A. "Gasoline"

█ In order to create "lead credits" under the EPA's "banking" program, an importer must import "gasoline" as defined in the regulations. Two requirements must be met for a petroleum product to be considered "gasoline": (1) it must be fuel of a type "sold in any State for use in motor vehicles and motor vehicle engines," and (2) it must be "commonly or commercially known or sold as gasoline." 40 C.F.R. § 80.2(c).[2] The EPA's regulatory definition is non-technical and provides no objective test against which product can be measured. As the trial court noted, in determining whether a product is "gasoline," the courts are resigned to using "other objective standards available as a way of postulating some formula or standard which encompasses this legal definition." A number of standards were presented to the trial court, including specifications of the American Society for Testing and Materials ("ASTM").

The ASTM has established a standard specification for automotive gasoline.[3] This specification, "established on the basis of the broad experience and close cooperation of producers of gasoline, manufacturers of automotive equipment, and users of both," provides guidance "in establishing the requirements of gasoline for ground vehicles equipped with spark-ignition engines." As the specification itself admits, "[i]t neither necessarily includes all types of gasolines[4] that are satisfactory for automotive vehicles, nor necessarily excludes gasolines that may perform unsatisfactorily...." Although the specification does not provide an objective, comprehensive definition of gasoline, it is useful to the court as an aid in determining whether a particular product is "commonly or commercially known or sold as gasoline"; the standard was developed in conjunction with gasoline producers, automotive equipment manufacturers, and users of both. In addition, it has been incorporated into certain federal procurement standards. Because of the broad-based participation of key groups in developing the standard and its use in federal procurement practices, we accept that standard as our guide in determining whether a product is "commonly or commercially known" as "gasoline."[5]

The ASTM standard identifies several characteristics of gasoline. These characteristics include, but are not limited to, sulphur content, gum content, vapor pressure, oxidation stability, and octane content. The specification establishes objective standards for each of these several characteristics. For example, the specification establishes 87[6] as a minimum octane level[7] for leaded gasoline. Similar objective standards are established for each of the other characteristics identified in the specification.

---

2. To be "gasoline," the imported product does not actually have to be sold as such. Coastal's imported product was not sold directly on the market as gasoline.

3. The relevant standard is designated as D 439 and is entitled "Standard Specification for AUTOMOTIVE GASOLINE." The standard indicates that it is a living document subject to change; it represents a description of gasolines at a given point in time.

4. "Gasoline" is broadly defined in ASTM D 439 as "a volatile mixture of liquid hydrocarbons, generally containing small amounts of additives, suitable for use as a fuel in spark-ignition internal combustion engines."

5. In its Memorandum in Support of its Cross–Motion for Partial Summary Judgment on Liability, even the government admits that EPA employees have indicated that in determining whether a fuel was "gasoline" under the EPA's regulations, "a relevant inquiry is whether the product meets the specifications known to be commonly used in industry, such as ... American Society for Testing and Materials specifications...."

6. All references to octane used in this opinion are $(R + M)/2$. This formula refers to the research octane number plus the motor octane number divided by two. *See* 40 C.F.R. § 80.2(d).

7. The ASTM standard provides for various adjustments to this octane level. Once these adjustments are applied, the minimum octane level falls to 80.8. These adjustments and their significance in this case are discussed later in this opinion.

In its order, the trial court recognized that a number of characteristics are considered in determining whether product is "gasoline" and that octane plays a critical role in that determination. The court also acknowledged that to be "gasoline" a product must be both (1) fuel of a type "sold in any State for use in motor vehicles and motor vehicle engines" and (2) "commonly or commercially known or sold as gasoline." *Id.* However, the lower court focused its analysis on the second portion of the definition and based its ruling exclusively on the octane level of the cargos.

(1) "Commonly or commercially known or sold as gasoline"

■ The record reveals that the trial court had before it the results of tests that inspectors had performed on each of the five cargos imported by Coastal. Coastal's expert witness testified that each cargo satisfied all ASTM standards for gasoline. The government did not dispute that the test results satisfied the ASTM standards with regard to any characteristic of gasoline other than octane content. As to octane content, the government contended that the cargos fell below a level found in product that was "commonly or commercially known or sold as gasoline."

In determining whether any of the cargos imported by Coastal were "commonly or commercially known or sold as gasoline," the trial court specifically stated that "[t]he parties agree that Coastal's fuel met all [ASTM D 439] requirements, except [for octane content]." As to octane content the court stated that "[a] thorough review of all the specifications reveals that the minimum octane level for leaded gasoline is 87(R + M)/2. Allowable deductions ... reduce this minimum to 81.8(R + M)/2. Therefore, the only cargo ... imported by Coastal that qualifies as gasoline is the Pacific Hunter" (I) shipment with an octane level of 82.6, all other octane levels of the Coastal cargos being below 81.8.[8] The trial court's holding, at least as to the second part of the two-part definition of "gasoline," rests solely on a determination that product with an octane level above 81.8 is "gasoline" and product with an octane level below 81.8 is not "gasoline."

8. The cargos, and their respective octane contents as reported by Coastal and as relied upon by the trial court, were as follows.

| Cargo | Octane Content |
|---|---|
| Pacific Hunter (I) | 82.6 |
| Pacific Hunter (II) | 80.9 |
| Potomac Trader | 81.45 |
| St. Michaelis | 81.7 |
| Scottish Lion | 81.55 |

In addition to these octane levels, the record also indicates that the octane content as reported by Coastal to United States Customs for the Pacific Hunter (I) cargo was 81.2 and for the Scottish Lion cargo was 80.3. The government contends that we must rely on the lower octane levels reported to Customs in determining Coastal's cross-appeal. Although the different octane levels on these two cargos arguably present a factual dispute that would render summary judgment inappropriate, we do not consider these different readings to raise a "genuine issue of material fact" in light of other undisputed facts in this case.

As to the Pacific Hunter (I) cargo, the 81.2 octane reading reported to Customs is still above a properly calculated minimum octane level specified by the ASTM after adjustments are applied. *See supra* note 7. The different reading on this cargo is, therefore, immaterial.

As to the Scottish Lion cargo, we note that the record indicates that the 81.55 reading is the reading upon discharge, and the 80.3 reading

appears to be a reading taken upon loading. The difference in the two readings was not explained by the parties. It may merely reflect the imprecision in measuring octane levels. We also note that on appeal the government has not directly challenged the trial court's reliance on the octane levels reported in the chart above.

Standing alone, however, the 80.3 octane level is not dispositive of the status of the product as "gasoline." Although octane content is critical in determining whether a product is "gasoline," octane content is not the only criteria. Assuming 80.3 is the octane level of the Scottish Lion cargo, in a situation such as this, where a product indisputably meets all ASTM criteria (except octane content) and where there is evidence of gasoline with octane levels as low as 80 being sold, *see infra*, we believe that there can be no doubt that such product is "commonly or commercially known" as "gasoline" where its octane content falls a mere fraction of a point below the ASTM minimum adjusted octane level of 80.8. The process of classifying product as "gasoline" does not rely on a "bright-line" test and is not as precise as the trial court order might suggest. The ASTM standard admits as much. Presumably, if the EPA wished to inject more certainty into the task, it could do so through a regulatory revision.

In its cross-appeal, Coastal argues that in arriving at 81.8 as a minimum octane level the trial court committed a mathematical error and that if the math is performed properly, the minimum acceptable octane rating as specified by the ASTM is 80.8. Because all of the Coastal cargos had octane levels exceeding 80.8, Coastal contends that it has satisfied the second part of the two-part definition of "gasoline."

The United States does not defend the mathematical calculation of the trial court. In fact, the government concedes that Coastal has raised a genuine issue of material fact as to whether the cargos are "commercially known" as "gasoline." We believe that Coastal has done more than that. Coastal correctly points out that the trial court erred in applying the ASTM specifications for octane levels.[9] As noted earlier, the ASTM establishes 87 as the minimum octane level for leaded gasoline. The ASTM further provides that this octane level can be reduced by up to 4.5 for variations in altitude and by as much as 1 for climatic conditions. This results in a minimum octane level of 81.5.

In addition, the ASTM recognizes that octane measurements may be imprecise. As a consequence, the ASTM specification suggests that an octane measurement of a particular cargo may differ from another measurement of that same cargo by as much as .7 before the test results are considered suspect. We do not necessarily agree with Coastal that this .7 "precision variance" is automatically made a part of the ASTM specification for all purposes. However, the ASTM's recognition of measurement variances informs this court's judgment and for purposes of determining whether a particular product is "commonly or commercially known or sold as gasoline," a .7 reduction in the minimum octane level is appropriate.[10] Taking into account this "precision variance," the minimum octane rating for gasoline under the ASTM standard is 80.8. The octane level of all of Coastal's cargos exceeded the 80.8 octane level.[11] Because all five of Coastal's cargos meet all of the ASTM requirements for gasoline, including octane content, we believe there can be no question that those five cargos are "commonly or commercially known" as "gasoline."

### (2) "Sold in any state"

■ For a product to be "gasoline" within the meaning of the EPA regulations it must not only be "commonly or commercially known or sold as gasoline," it must also be "sold in any State for use in motor vehicles and motor vehicle engines." *Id.* On appeal the government focuses its attack on this part of the "gasoline" definition and argues that Coastal has failed to demonstrate that fuel with an octane level of 82.6 (the highest octane level of any of Coastal's cargos) or below was "sold in any State for use in motor vehicles." The government presented the trial court with a variety of studies showing that the majority of gasoline sold throughout the country has an octane level above 82.6. However, the trial court apparently did not find the evidence on this point in favor of the government[12] and neither do we.

---

9. Our reading of the trial court order suggests that the court relied on a federal procurement specification modified by the ASTM standard specification in arriving at its minimum octane level. As we stated earlier, for purposes of determining whether a product is "commonly or commercially known" as "gasoline" we accept the ASTM as our guide. *See supra* note 5 and accompanying text.

10. In its order, the trial court noted that the ASTM standard provides for a .7 "precision variance," and the court, in fact, applied a .7 reduction in its analysis. Although the applicability of this "precision variance" was disputed by the parties below, on appeal the government has not addressed the issue. Testimony before the trial court revealed that the "precision variance" could be used. In addition, the government's own witness stated that the State of Maryland routinely applies a .7 variation in determining compliance with State octane specifications.

11. *See supra* note 8.

12. The trial court's order acknowledges that this part of the two-part definition must be satisfied for product to be properly classified as "gasoline." Beyond this acknowledgment, the court did not discuss how this part of the definition was met in this case. However, the trial court implicitly found that this portion of the definition was satisfied with respect to the Pacific Hunter (I) cargo because it found that cargo to be properly classified as "gasoline."

As we read the regulation, all that an importer must do to satisfy this part of the definition is to show evidence of a single sale in one state of gasoline of the same type as that being imported. This Coastal did by evidence of "postings." The Federal Trade Commission requires that the octane content of gasoline be posted at the pump. *See* 16 C.F.R. pt. 306. The actual octane content must equal or exceed the posted octane content. *See id.* § 306.9(c). Coastal presented evidence to the trial court that at four service stations in the United States the posted octane level was below 82.6. One station (in Oregon) had a posted octane level of 80, which is lower than all of Coastal's imported cargos. We find, as the trial court implicitly must have, that this is sufficient evidence to satisfy the first part of the definition.

The government argues that this is insufficient evidence to support the conclusion that gasoline with octane levels as low as that of the Coastal cargos was sold in any state. The government insists that these postings, admittedly a tiny fraction of the full number of postings, are the result of transcribing errors. The government also suggests that, based upon its surveys, the actual octane content exceeds the posted octane level and that postings are not evidence of actual sales. Other explanations are offered by the government. However, the government fails to offer any evidence that the posted octane content of 80 at the one station was, in fact, the result of a scriveners error. Nor did the government prove that the actual octane content of the gasoline in the pump exceeded the posted octane level of 80 or that there was no sale of such low octane gasoline from that station. We agree with Coastal that this posting presents a prima facie case as to the actual octane level of the gasoline at that station and that postings are evidence of sales. On this record, this posting establishes a material fact in favor of Coastal over which there is no genuine issue. Because Coastal has satisfied both parts of the two-part "gasoline" definition, it is entitled to summary judgment as to all five cargos. We affirm the trial court's judgment as to the Pacific

Hunter (I) cargo and reverse as to the other four cargos.

Because Coastal is not liable for any regulatory violation, we are not compelled to say more. However, we think it will be useful to state our views on the constitutionality of § 211(d) and to express our disagreement with the lower court's holding in this regard.

### B. *Constitutionality of § 211(d)*

Section 211(d) of the Clean Air Act provides that

[a]ny person who violates ... the regulations prescribed under subsection (c) of this section ... shall forfeit and pay to the United States a civil penalty of $10,-000 for each and every day of the continuance of such violation.... The Administrator may, upon application therefor, remit or mitigate any forfeiture provided for in this subsection and he shall have authority to determine the facts upon all such applications.

42 U.S.C. § 7545(d). After finding Coastal liable for violating the regulations of subsection (c), the trial court refused to impose the required penalty because the court determined that § 211(d) was unconstitutional. The court stated that

[s]ection 211(d) violates the Separation of Powers Doctrine because it subjects the judgment of an Article III Court to review by the Executive Branch. The Article III judge is, in essence, performing an administrative task by determining only the number of days of violation and imposing a mandated penalty. No discretion remains....

Furthermore, the obligatory penalty provision is pre-determined. By denying a defendant the right to present an equitable defense and the Court the right to use its discretion in imposing a penalty, the provision violates the established procedures and guaranteed rights of due process, and therefore violates the Fifth Amendment.

Likewise, the imposition of a $10,000 fine may be reasonable and justifiable in many circumstances; in others it may not be. Not allowing the Court jurisdiction to hear equitable defenses when assessing a penalty deprives the Court of

inherent discretion and may result in a penalty with no rational relationship between the violation and the penalty imposed.

We disagree with the district court's assessment that § 211(d) violates the principles of separation of powers and due process.

## (1) Separation of Powers

■ The trial court determined that § 211(d) violates the principle of separation of powers because it establishes a mandatory penalty and allows the Administrator of the EPA to remit or mitigate the penalty after it is imposed by the court.

The Constitution separates governmental powers into three coordinate branches. *Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 2620, 101 L.Ed.2d 569 (1988). It is this separation of powers that serves as a " 'safeguard against the encroachment or aggrandizement of one branch at the expense of the other.' " *Id.* (quoting *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1976)). The principle of separation of powers is violated when an "Act 'impermissibly undermine[s]' the powers of [one] Branch, or 'disrupts the proper balance between the coordinate branches [by] prevent[ing] th[at] Branch from accomplishing its constitutionally assigned functions.' " *Id.* 108 S.Ct. at 2621 (citations omitted). We see no evidence that § 211(d) of the Clean Air Act violates the principle of separation of powers. The constitutionality of congressionally established mandatory penalties such as that found in § 211(d) seems beyond doubt. *See Tull v. United States,* 481 U.S. 412, 107 S.Ct. 1831, 1840, 95 L.Ed.2d 365 (1987) (In denying the defendant's claim of a Seventh Amendment right to have a jury determine the amount of damages under the Clean Water Act, the Supreme Court reasoned that "the action to recover civil penalties usually seeks the amount fixed by the Congress.... Since Congress itself may fix the civil penalties, it may delegate that determination to trial judges."); *see also United States v. Regan,* 232 U.S. 37, 43, 34 S.Ct. 213, 215, 58 L.Ed.

494 (1914); *Hepner v. United States,* 213 U.S. 103, 108, 29 S.Ct. 474, 476–77, 53 L.Ed. 720 (1909). Similarly, statutes giving the executive branch the power to remit or mitigate a congressionally established and judicially imposed penalty have long been recognized and approved by the Supreme Court. *See Confiscation Cases,* 74 U.S. (7 Wall.) 454, 461–62, 19 L.Ed. 196 (1869) (Secretary of Treasury can "remit a forfeiture or penalty, accruing under [statutes], subsequent to the final decree or judgment"); *Johnson v. United States,* 74 U.S. (7 Wall.) 166, 174–75, 19 L.Ed. 187 (1869) (power of Secretary of Treasury to mitigate is not judicial exercise; rather it is one of mercy from which no appeal can be taken); *see also Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 690 n. 27, 94 S.Ct. 2080, 2095 n. 27, 40 L.Ed.2d 452 (1974); *The Laura,* 114 U.S. 411, 5 S.Ct. 881, 29 L.Ed. 147 (1885); *United States v. Morris,* 23 U.S. (10 Wheat. 246) 246, 292–96, 6 L.Ed. 314 (1825). The mandatory penalty and the mitigation authority provided the Administrator of the EPA in § 211(d) presents neither an aggrandizement of power by one branch at the expense of the other nor an encroachment of one branch on the other. Section 211(d) simply does not impermissibly undermine the powers of the judicial branch.

## (2) Due Process

■ As to the district court's holding that the mandatory penalty provision of § 211(d) violates due process by denying a defendant the right to present—and the court the right to consider—equitable defenses, we agree with the government that there is no inherent power for the judiciary to mitigate congressionally-mandated penalties. *See Clark v. Barnard,* 108 U.S. 436, 457, 2 S.Ct. 878, 890, 27 L.Ed. 780 (1883) ("where any penalty or forfeiture is imposed by statute ... courts of equity will not interfere to mitigate the penalty or forfeiture, ... for it would be in contravention of the direct expression of [Congress]"). A court in equity may not do that which the law forbids. *See Immigration & Naturalization Serv. v. Pangilinan,* 486 U.S. 875, 108 S.Ct. 2210, 2216, 100 L.Ed.2d 882 (1988).

■ The trial court also determined that § 211(d) is unconstitutional because the

mandatory penalty may bear no rational relationship to the violation involved in a particular case. In so doing, the court erred. A court may not declare a statute facially invalid based upon a hypothetical possibility that the law *may* be unreasonable in certain circumstances. *See United States v. Raines*, 362 U.S. 17, 20–22, 80 S.Ct. 519, 522–23, 4 L.Ed.2d 524 (1960) ("one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional"); *accord Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501–02, 105 S.Ct. 2794, 2800–01, 86 L.Ed.2d 394 (1985). The trial court failed to do that which it must—determine whether a statute is constitutional as applied to the facts in the case before it. *See Raines*, 362 U.S. at 21–22, 80 S.Ct. at 522–23.

It is unnecessary for this panel to consider the other arguments raised by the parties given our resolution of the determinative issue—Coastal properly classified its imported product as "gasoline."

The judgment of the district court is VACATED and the suit of the United States is DISMISSED.