# NO. 12-07-00196-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 307TH* |
| *A.T.S. AND M.D.S.,* | § | *JUDICIAL DISTRICT COURT OF* |
| *MINOR CHILDREN* | § | *GREGG COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Patrick S. and Kristina D. appeal the trial court's order terminating their parental rights to their sons, A.T.S. and M.D.S. In five issues, they contend the evidence is insufficient to support the order, the trial court used an improper procedure, impermissibly shifted the burden of proof, and failed to make a necessary finding of extraordinary circumstances to extend the temporary managing conservatorship, and Texas Family Code Section 263.405(i) is unconstitutional. We affirm.

## BACKGROUND

The Department of Family and Protective Services filed a petition for protection of a child, for conservatorship, and for termination of the parent-child relationship on February 1, 2006. At the time, A.T.S. was one year and nine months old and M.D.S. was eight months old. The petition was supported by an affidavit explaining that the children had been removed from the parents the day before due to their home environment and concerns for their physical care. The Department was appointed temporary sole managing conservator of the boys, and they were placed in foster homes. The parties agreed to a family service plan, and the trial court notified Patrick and Kristina that the failure to comply could result in the restriction or termination of parental rights.

At a status hearing held March 14, 2006, it was shown that Patrick and Kristina were homeless, tested positive for cocaine, and needed parenting classes and psychological evaluations. A hearing was held June 13, 2006 for judicial review. Both parents had secured jobs but still had no home of their own, continued to test positive for drugs, and had otherwise not complied with their service plan. Another judicial review hearing was held November 15, 2006. Patrick was not in attendance. It was reported that Kristina had completed parenting classes and a ninety day stay at Kirkpatrick Rehabilitation Center, previously tested negative for drugs, and gotten a job. However, she still needed to participate in a psychological evaluation, find a home of her own, and attend counseling. The court found that neither parent had demonstrated adequate and appropriate compliance with the service plan.

On January 18, 2007, Kristina and Patrick filed a motion for extension of time of 180 days from the current dismissal date, which was February 5, 2007. They asserted that they had completed many of the requirements of their family service plan. They requested additional time for the Department to ascertain that their new living arrangement was a safe and suitable place for the children and then to begin a monitored return of the children. Evidence was presented on that motion at the hearing on January 22, 2007.

At the hearing, Kristina testified that she had complied with the Family Service Plan. She received drug assessment, counseling, and rehabilitation. She got a job as a cashier and had remained drug free. She admitted that she had not completed and returned some documents Child Protective Services (CPS) asked for. She moved in with a man named Courtney when she got out of Kirkpatrick. But she left him because he was abusive. Other than that, she had stayed away from people engaged in criminal activity. She was living in a home in Liberty City with Patrick, his brother Damon, and Damon's girlfriend, Delynda. They planned to share the rent and household chores.

Patrick was released from a drug rehabilitation facility less than a week before the hearing. Kristina testified that an oilfield job was available for him to take. Kristina asked the court for an extension of six months so that she and Patrick could continue to work toward completing their plan and have a monitored return of the children.

On cross examination, Kristina stated that she completed her psychological testing last May

and had not participated in psychological evaluations since then. She admitted that she did not go to counseling that CPS arranged. Instead, she arranged to go to Kirkpatrick. Since leaving Kirkpatrick, she had not taken a drug test on the same day she was requested to take it and had never submitted to a hair follicle test. She stated that she did not work forty hours a week. She worked about thirty hours a week and was not seeking full time employment. Patrick had not gone to work even though he had been out of rehabilitation for over a week. Kristina had not participated in face to face home visits with her caseworker. She said she had been visiting her children regularly and would be able to get insurance on them through her employer. There was a phone at the residence, but she had no car and relied on Delynda for transportation. If given an extension, she would save money for daycare, establish her own residence, and get a car.

No further evidence was offered on the motion to extend. The trial court carried the motion, explaining that it would be considered as the rest of the evidence was heard that day, leaving the option open as a possible result of that hearing. The Department then presented its evidence on the motion for termination.

Erica Ayers, a Child Protective Services investigator, accompanied by a police officer, went to Kristina's apartment on January 31, 2006 in response to a report the Department had received. There was no electricity, the house was cluttered, and the kitchen surfaces were covered in leftover food and trash. The apartment was unsanitary. There was a baby crib, but it was not in a usable condition. The children wore only diapers and were dirty; the older child appeared lethargic. Kristina looked as though she had not bathed in several days and appeared to be under the influence of some substance. Ayers removed the children from the home that day. A.T.S. was seen by a doctor and found to be developmentally delayed, malnourished, and under the influence of cocaine. Both parents also tested positive for drugs. Based on the existence of some bruises on Kristina's leg and Patrick's volatile temper, Ayers suspected domestic violence.

Kristina took the stand again and explained that she and Patrick had lived in an apartment in Gladewater at the time the children were taken. In February, they lived with a friend in Gladewater and then lived with Patrick's cousin in Kilgore. After leaving the cousin's home, they rented a room at a motel. In July, she moved to Kirkpatrick Rehabilitation Center where she stayed until the first week in October. She had worked at a department store in Gladewater. Other than odd

3

jobs, Patrick did not work. After she got out of Kirkpatrick, she moved in with another man, whom she reported for abusing her. She moved out of that home on December 20.

Kristina admitted that she and Patrick had an abusive relationship. Kristina did not know if Patrick had gone to any counseling. As far as she knew, Patrick had not held a job since February 2006. She heard Patrick threaten a CPS worker when they were not allowed to see their children.

Kristina had a hair follicle test in February 2006 that was positive for cocaine. She also tested positive for cocaine on March 22. After that, she took drug tests several days after being asked to rather than within twenty-four hours as requested by CPS. Since her release from Kirkpatrick in October, she had not attended any counseling sessions. She attended one Alcoholics Anonymous (AA) meeting. She had not paid any of the court ordered child support. She said she had been looking for a full time job but had not actually applied anywhere. Kristina explained that she was working when A.T.S. ingested cocaine so she did not have any explanation for it. She testified that Patrick told her that Leona Merrill, someone they did drugs with, came over the night before CPS came to the house. Patrick told her Merrill brought some Little Debbie's brownies that had crack cocaine in them and A.T.S. ate some of the brownies. When she came home from work, she noticed he had a fever and she thought he was sick, but she did not take him to a doctor. Neither of her children had routine checkups. Kristina said that Patrick provided her with cocaine.

On cross examination, Kristina admitted that she had not saved any money, and she had no plan in place for living arrangements if she and Patrick separated. At the time the children were taken away, she was working as an exotic dancer. When she worked, Patrick took care of the children. Patrick worked at "odd jobs" and sometimes had a "real job" for short periods of time. The night A.T.S. had a high fever, Kristina was worried about him, but she had no vehicle or phone and did not take him to the hospital. She said that if the court gave them an extension of six months, they would establish their own residence and get a vehicle. Kristina testified that, last March or April, they went through psychological testing, and she stated that she had completed parenting classes.

Patrick admitted that he tested positive for cocaine in February 2006 and at other times between February and December. He said he used cocaine on December 8 and checked into Oak Haven Treatment Center for rehabilitation on December 10. He said he had joined the Navy in 1990

4

to avoid a conviction for selling cocaine. Since then, the longest time he had been "clean" was from 1995 to 1997. The week before CPS took the children, he had spent $400.00 to $500.00 on cocaine and said he had probably spent that amount on cocaine each week since then. He had paid no child support since the case began. He hauled scrap iron, sold copper, and had a full time job for three weeks in August.

In compliance with his service plan, he submitted to the psychological evaluation and a drug assessment, and completed the treatment at Oak Haven. He offered no excuse for not completing the plan's requirements "other than [he] was spun out on drugs." He said there were times when he tried to have a drug test, but CPS had not provided the paperwork so he was not able to have the test done. He had been to two meetings since leaving Oak Haven. Patrick summed up his position by explaining:

> I know I haven't been a good dad. I've probably been the worst dad on the planet. I have a drug problem, and I'm trying to work through my drug problem. And I'm going to be a good father, and I want my kids back. I think I deserve my kids back. I've got a lot of making up to do. Whatever the Court sees fit that I need to do, I'm willing to do that to get my kids back.

On cross examination, Patrick explained that he went to Oak Haven because he realized that nothing in his life was working. He has two teenage sons from a previous marriage. He was involved in supporting and raising them, changing diapers and coaching little league. However, they have not wanted to see him because of his drug addiction. The older one had expressed interest in seeing him since he went to Oak Haven. Patrick admitted that he had not paid the $250.00 in monthly child support for them since 2005.

Patrick explained that, on the night before the Department took the children, two of his friends came over to smoke crack cocaine with him while Kristina was at work. One of them brought some Little Debbie snacks. A.T.S. ate part of a brownie but would not finish it. A.T.S. had trouble sleeping that night and was shaking. Patrick did not have a phone, so he did not call anyone for help. Patrick regretted what had happened and insinuated that the friend deliberately gave cocaine to A.T.S. in one of the brownies without Patrick's knowledge. He said he would comply with court orders, remain calm when the children do something wrong, help them with school work, and read to them. He said the home he shares with his brother is a good, clean, safe environment for

5

children.

Patrick had a job lined up in the oilfield that would pay $15.00 an hour and would require him to work seventy or eighty hours a week. He stated that he had the skills to get and hold a job and was looking forward to raising his children. He said he would be working by Friday and would be able to pay his bills and provide for his family. Within three months he would have his own residence. He explained that he and Kristina had been engaged for two and a half years. He did not know why they had not gotten married, but he planned to get married in the next couple of months. He knows that children should not be around drugs and said he was not going to do drugs anymore.

He admitted he had never taken his children to a doctor or a clinic but said that, in an emergency, he knew how to get help. He admitted that he and Kristina had an abusive relationship and he had left bruises on her. He explained that he did not pay the electric bill at the apartment because of his drug addiction, but he was turning his life around. He believed that it was best for the children if they lived with their parents.

Martha Christian testified that she is the CASA volunteer guardian for the children. When she first met A.T.S., he was almost two years old and could not speak. He exhibited a poor gait and had eight cavities. He has had physical therapy and speech therapy. Initially, Kristina and A.T.S. did not seem to have much of a relationship. Kristina did not see him from February until July because she did not pass her drug tests. By the date of the hearing, they were interacting, although there was no bond between them. They played together, Kristina was affectionate toward him, and he seemed happy to see her. He called her mama. M.D.S. reacted to Kristina the way he reacted to others. Kristina did not see him until she got out of Kirkpatrick in October. Christian testified that she could not see that A.T.S. and M.D.S. were bonded in any way. At visits, they played side by side but not interactively. When the visit was over, they happily went with the person who took them back to their respective foster parents. Since getting out of Kirkpatrick, Kristina had missed four visits. Christian stated that M.D.S.'s foster mother wanted to adopt him.

Christian was present once when Patrick visited the children. A.T.S. pulled away and did not seem comfortable. M.D.S. did not seem to have any recollection of Patrick.

Christian explained that in their November meeting, Kristina was told she could ask for help with housing and furnishings, but by the December meeting nothing had been done. When she found

6

out Kristina's new address, she did not visit. Kristina never invited her and she "did not feel secure" in going there. She was afraid of Patrick and whoever lived there with them. Christian did not believe Kristina completed a psychological evaluation or an outpatient treatment program for substance abuse. She testified that Kristina needed a lot of support, which she had not had, and she had not had any homemaking services. Christian was concerned about the instability in Kristina and Patrick's relationship because the children needed a stable home. She said they needed a home of their own, not with other people. Christian testified that she did not believe Kristina and Patrick could meet the needs of the children and it would be in the children's best interest to have the parents' rights terminated.

Kristie Dewberry, a caseworker for CPS, enacted the family service plan for Kristina and Patrick on February 9, 2006 and worked with them to achieve those goals. According to Dewberry, Kristina did not complete and return all of the necessary forms. She did complete parenting classes at Kirkpatrick but not the parenting classes at Parenting Resource Center as specified by the plan. Kristina did participate in a drug assessment and enrolled herself in Kirkpatrick Center for drug treatment. However, at times she did not submit to random drug testing within twenty-four hours of the request as required by the plan. One time, Kristina went to the wrong address even though Dewberry had given her the correct address. Contrary to Kristina's testimony, Dewberry said she had the proper paperwork on file at the drug testing facility in a timely manner.

In October, Dewberry told Kristina that she had not completed the psychological evaluation and Kristina said she thought she had. The psychologist's records, which were introduced into evidence, indicate that Kristina cancelled all appointments and never showed up for testing. Dewberry denied the possibility that Kristina actually went for a psychological evaluation and the paperwork got lost. Dewberry explained that Kristina had not enrolled in counseling since leaving Kirkpatrick and counseling would have been available to her if she had completed her psychological evaluation. Dewberry stated that, to her knowledge, Patrick and Kristina had not worked together in counseling on domestic violence issues.

Kristina was to get a job, which she had done, and utilize agencies such as Medicaid, housing authority, and WIC, which she had not done. She was to participate in intense child development, nutrition, and age appropriate classes, but she had done none of that. The Department was to provide

7

her with homemaking services when she established a home. Dewberry admitted that, at the November and December meetings, she told Kristina that the Department could help her find suitable housing and furnishings.

Dewberry reported that Kristina had not established and maintained appropriate housing or shown the ability to budget for rent and utilities on a monthly basis. Kristina previously lived with her abusive boyfriend and his mother and stepfather. Dewberry asserted that this showed Kristina could not make good choices. As of the date of the hearing, Kristina was staying with Patrick's brother. Dewberry testified that living with other people in transient situations did not constitute compliance with the plan. Dewberry had not visited Kristina's latest residence because Kristina had only recently given her the address. Dewberry said it was critical that she assess Kristina's living arrangements by visiting the residence, but Kristina had done nothing to facilitate a visit by Dewberry. She explained that she had not received enough information about the people Kristina was living with to know if they were safe or appropriate to live with the children. Kristina had not given any indication that she was ready to establish her own residence.

Dewberry testified that Patrick accompanied Kristina when she came to visit the children on December 22. She did not know he was coming, and he was not allowed to visit. He had done very little on his plan at that time, although the prior summer he completed a psychological examination. Dewberry stated there was nothing to show that Patrick was off drugs, and it did not appear that Kristina would be able to avoid drugs while she was living with Patrick. Dewberry did not believe the children could safely be returned to either parent. The Department wanted termination of the parents' rights. Dewberry did not believe Patrick and Kristina could fulfill the requirements of their family service plan if given an extra six months. She said it was in the children's best interest to not give the parents more time. Dewberry testified that CPS had put into place all services it needed to and it was the parents' actions that are lacking.

Shuronda Thurmond, a CPS supervisor, was the caseworker on this case from February 2006 until August 2006. Patrick and Kristina were to start parenting classes at Parenting Resource Center in April 2006, but they never showed up. Kristina did a portion of the psychological evaluation and was supposed to set up an appointment to return and finish but she never did. Every time Thurmond tested them for drugs, they both tested positive for cocaine. One time after testing positive and

8

having his visitation rights suspended, Patrick went to the CPS office "ranting and raging." He told her over the phone that somebody better get his "mother f.....g kids" to the CPS office or somebody was going to get hurt because he was going to visit his kids that day. In the seven months Thurmond was involved with the case, neither Kristina nor Patrick tested clean for drugs or established a stable home. Thurmond, who knew the family Kristina moved in with after she left Kirkpatrick, stated that family was not a positive influence.

At that point in the proceeding, the Department rested its case, and the court denied Kristina and Patrick's motion for directed verdict. Kristina and Patrick then presented their witnesses.

Laurie Burkhart, a drug and alcohol counselor at Kirkpatrick Family Center, testified about Kristina's stay there from July 6, 2006 until October 11, 2006. A.T.S. stayed with Kristina while she was there. Burkhart said that Kristina had an extensive treatment plan, received counseling, and learned a lot of parenting skills. After about twenty-five or thirty days, Kristina told her she made a life change in the areas of her lifestyle, drug use, occupation, and spirituality. Burkhart testified that if Kristina would continue to stay clean and do the right things, and if she was not being controlled by anyone in a relationship capacity, she would have a chance at success in the future. If these other things were in place, she had the ability to provide for the physical and emotional security for her children. Burkhart stated that Kristina should be in individual and group counseling. Burkhart commented that it was "very positive" that Patrick went to Oak Haven. She stated that she would find it suspicious that Kristina refused a hair follicle test and would be concerned if she did not respond quickly to requests for tests. She testified that it takes three to five days for cocaine to be eliminated from the body.

Delynda Baltieria explained that her boyfriend, Damon, is Patrick's brother. She and Damon rented a home in Liberty City. Patrick and Kristina were living there with them, sharing expenses and household responsibilities. They had family meetings to work on conflicts. She and Damon both had full time jobs. She did not have a criminal record. Damon had been in trouble with the law for possession of marijuana. She had some experience with little children and having A.T.S. and M.D.S. in the house would not be a problem for them or the landlord. In the time she had known Patrick, he had not been drug free. She did not know Patrick and Kristina well at the time the children were taken away. She had never been to their apartment and had never seen them with their

children. However, Baltieria vowed to help Patrick get his children back and said that, no matter how long it took him to get a job, he had a place to stay.

Counsel for Patrick and Kristina then reoffered Kristina's testimony on the motion to extend and the testimony Patrick gave when he was called by the State. Patrick and Kristina then rested. Both sides closed.

The court found that the Department proved by clear and convincing evidence that Kristina and Patrick

> knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;
> engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children;
> failed to comply with the provisions of a court order that specifically established the actions necessary for the [parent] to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children.

Those findings were reflected in the court's order signed January 30, 2007. Also in that order, the court took the issue of best interest of the children under advisement and set a hearing for April 27, 2007 for further consideration of that issue. The court named the following specific matters to be reviewed at that hearing: the results of drug tests, employment of the parties, counseling, attendance at AA or Narcotics Anonymous (NA) meetings, establishment of a residence and the ability of the parties to budget for monthly expenses, and payment of child support. The court ordered that the Department of Protective and Regulatory Services would continue as temporary managing conservator of the children. Further, pursuant to Section 263.401(b) of the family code, the court found that it had continuing jurisdiction of this suit, the appointment of the Department as temporary managing conservator continued to be in the best interest of the children, extraordinary circumstances existed, and an extension of the dismissal date should be granted. Accordingly, the court ruled that the suit would be dismissed on August 4, 2007 unless a final order was rendered before that date.

At the April 27, 2007 hearing, the State called Patrick to testify. He testified that he and Kristina presently resided in a rented home with his brother and his brother's fiancé. His brother's

two children once came to visit, and they slept in the third bedroom. That room did not have beds, but they slept on foam mattresses. He started training to work for TCIM Services on April 23. After his ninety day probationary period, he would be able to get insurance for his children through his employer. For the three months before that, he worked for a temporary agency. He claimed to have worked "practically every day" but had not paid any child support. He and Kristina had attended marriage counseling twice. He had been to Oak Haven twice and to AA or NA meetings nine times. He testified that he did not attend meetings from about mid-February to mid-March because he was working nights. However, he was not able to find his pay stubs for those weeks. About a week before the hearing, they purchased a 1992 Pontiac, which broke down two days before the hearing and which he was unable to drive because his license had been suspended. Patrick explained that he opposed the dental surgery A.T.S. had because he did not want him "put to sleep" for a surgery that was not necessary. Although he went to the location where the surgery took place, he had to leave to go to work before A.T.S. was out of surgery.

On cross examination, Patrick reiterated that he went to work right after the last hearing and had worked "consistently" since then. However, his pay stubs indicated that he worked as little as twenty hours per week. He also explained that when he got an ID, he would be going to work for another company where he would work eighty or ninety hours a week. He also stated that Kristina had a job. Patrick testified that, over the last three months, he and Kristina averaged $1,600.00 each month in income. Their monthly expenses totaled $1,485.00. He did not know how much food and clothing for the children would cost. They had saved $700.00 to put down on the car. They presently had $315.00 saved and were continuing to save money to use as a deposit on a house of their own, which he hoped to be able to get by the end of May. Patrick testified that someone at the Veterans Association told him that because he is a veteran, he and his dependents would have lifetime health insurance. He explained that the meeting he went to at Oak Haven was like a Narcotics Anonymous meeting. He found it beneficial and intended to continue to attend those meetings as well as the NA and AA meetings. Patrick presented three lab reports indicating that on those three dates in March and April when he was tested, he was drug free. He vowed to remain drug free for the rest of his life. He believed he had taken the necessary steps to show that he and Kristina were ready to begin the reunification process with their children and that reunification was in the children's best interest.

11

He was adamant that if the children came home with him, he would find a way to get a bed for them to sleep on.

Kristina testified that she quit her job as a cashier at Brookshire's in early March because she was not getting enough hours. She wanted to stay at home and get ready to be a housewife. She did not work for six weeks, but began working at her present job two weeks before the hearing. She had not paid any of the court ordered child support. Kristina thought Patrick was working every day from 6:00 to 6:00 except for one night job. She had not taken illegal drugs since July 2006. She still had to rely on other people for transportation. On the day A.T.S. had surgery, she stayed at the hospital until 12:15 p.m. but then left because she did not want to sit there worrying. A.T.S. was not yet in recovery when she left, and she did not return to the hospital. She and Patrick attended marriage counseling twice. She never had a psychological evaluation and never sought to have CPS arrange counseling for her. She went with Patrick to NA meetings, but they missed from February 12 until March 12 and from March 29 until April 20. She explained that, at one visitation, Patrick got upset and loud because M.D.S. was late. Kristina denied that Patrick got upset or raised his voice at home.

Kristina said she had not missed any visits with her children and Patrick had missed visits only when he was unable to get off work. She explained that Patrick sincerely wanted to visit his children and the foster parents were not able to reschedule. She testified that she thought it was right for the children to come home when there were no beds for them because Patrick said they could get a bed for them. She said Baltieria would babysit for her while she works until she is able to find daycare for them, but they had not discussed whether Kristina was to pay her for babysitting. She explained that Baltieria worked at night, getting off at 2:00 a.m. She clarified that the budget she and Patrick drafted reflected their present circumstances and therefore did not include expenses for the children.

Martha Christian testified that her opinion had not changed since the last hearing, and she still believed that termination of the parents' rights was in the best interest of the children. She was present for all the visits Patrick and Kristina had with their children. Sometimes Patrick was lethargic and then very energetic. There was a lot of wrestling, rough play, and crawling around on the floor. The children laughed and played with the parents but then got very stimulated and hit the

12

parents, climbed on the furniture, and threw things. Then the parents would issue a lot of reprimands that the children did not respond to. In every one hour visit, the children had been placed in time out. Rather than being nurturing visits, the visits were "wild" according to Christian. She described an instance where the caseworker asked the parents not to let the children get in one corner she felt was unsafe and Patrick responded by saying, "This is my visit. I'll do it my way." The next time they had a visit, Patrick encouraged A.T.S. to hide in that same corner during a game of hide and seek.

Since the last hearing, Patrick and Kristina had not sought to interact more appropriately with the children. At one visit, Patrick got very loud saying he had done everything CPS asked him to while CPS would not cooperate with him at all. The foster parents left because they were afraid. Christian explained that A.T.S. really liked the wrestling, but Patrick's actions evidently frightened him at that visit and he shied away from Patrick. She explained that she previously had a working relationship with Patrick and Kristina, but since the last hearing they did not speak to her unless they had to. Christian stated that she had not been to their home. She explained that A.T.S. had improved since being in foster care, especially in the area of aggression. He was much calmer and she felt the rough play was "the kind of behavior that [he had] overcome." Christian described M.D.S. as very calm by nature and very amenable. She said that, at their visit the day before the hearing, M.D.S. put a pillow between himself and Kristina, acted very shy, and asked for his brother.

The Department rested. Patrick took the stand and described his visits with his children, saying they play and roughhouse. But he said Christian's description of the excessiveness and displeasure was not accurate. He said the play never got out of hand, although they wrestled and A.T.S. might punch his mother. Patrick would tell A.T.S. not to play as rough with his mother as he did with him. He testified that was the extent of the kind of reprimand he gave his son. He said A.T.S. loved playing hide and seek, and he denied there was anything dangerous about the corner of the room that he was warned about. He explained that he had discussed child care with Baltieria, and she would watch the boys while he and Kristina work. However, he felt that a mother's place is at home with the children and did not expect her to have to work. He plans to "get it so she won't have to." He explained that the children's things were in storage, and he believed the crib was at his uncle's house.

Counsel asked the court to take judicial notice of Baltieria's and Burkhart's testimony at the

previous hearing.  All parties closed.  The trial court found that it was in the best interest of the children to terminate the parent child relationship.

The trial court's final order of termination of parental rights, signed by the trial court on May 9, 2007, recited that the court heard evidence on January 22, 2007 and April 27, 2007 and incorporated the court's findings of fact pronounced on January 22.  The court also found by clear and convincing evidence that termination of the parent-child relationship between Kristina and the children who are the subject of this suit, and between Patrick and the children who are the subject of this suit, was in the children's best interest.

**TERMINATION OF PARENTAL RIGHTS**

In their first issue, Kristina and Patrick contend the evidence is legally and factually insufficient to support the termination order.  Specifically, they assert the evidence is insufficient to show that termination is in the best interest of the children.  Additionally, within that issue, they complain that the trial court erred by refusing to make their requested findings of fact and conclusions of law.  They also contest certain findings of fact, including the following findings that are also set out in the court's order:  that they knowingly placed or knowingly allowed the children to remain in conditions and surroundings that endangered the physical and emotional well being of the children, that they engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical and emotional well being of the children, and that they failed to comply with the provisions of a court order that established the actions necessary for them to obtain the return of the children.  Additionally, they contest the conclusion of law that the Department should be appointed managing conservator of the children.

**Standard of Review**

In reviewing the legal sufficiency of the evidence to support termination findings, an appellate court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.  *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).  In order that proper deference is shown to the fact finder's role, an appellate court must presume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact

14

finder could have disbelieved or found incredible. *Id*. However, a reviewing court is not required to ignore all evidence not supporting the finding because that might bias a clear and convincing analysis. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id*.

This standard retains the deference an appellate court must have for the fact finder's role. *In re C.H.*, 89 S.W.3d at 26. Additionally, the trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied). Thus, our review must not be so rigorous that only fact findings established beyond a reasonable doubt could withstand review. *In re C.H.*, 89 S.W.3d at 26.

**Applicable Law**

Involuntary termination of parental rights embodies fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). A termination decree is "complete, final, irrevocable [and] divests for all time the parent and child of all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Id*. However, parental rights are not absolute, and it is vital that the emotional and physical interests of the child not be sacrificed at the expense of preserving that right. *In re C.H.*, 89 S.W.3d at 26.

Section 161.001 of the Texas Family Code permits a court to order termination of parental

15

rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2007). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM. CODE ANN. § 161.001(1); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.). Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2); *Green*, 25 S.W.3d at 219-20. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list is not exhaustive, but simply indicates considerations that have been or could be pertinent. *Id*.

Additionally, both elements of Section 161.001 must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002). There is a strong presumption that the best interest of the child is served by preserving the parent-child relationship. *Wiley*, 543 S.W.2d at 352. Thus, the burden of proof is upon the person seeking to deprive the parents of their parental rights. *Herrera v. Herrera*, 409 S.W.2d 395, 396 (Tex. 1966).

**Analysis**

In both its January 30 and May 9 orders, the trial court found that Kristina and Patrick engaged in three of the acts or omissions itemized in Section 161.001(1). The court found that they knowingly placed or allowed the children to remain in conditions and surroundings that endangered the physical and emotional well being of the children, engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical and emotional well being of the children, and failed to comply with the provisions of a court order that established the

16

actions necessary to obtain the return of the children while the children had been in the temporary managing conservatorship of the Department for not less than nine months. *See* TEX. FAM. CODE ANN. § 161.001(1) (D), (E), (O). Kristina and Patrick complain of these findings as well as the trial court's appointment of the Department as managing conservator of their children. However, we are unable to review these complaints.

Subchapter E of Chapter 263 of the Texas Family Code governs final orders in conservatorship and termination proceedings in cases involving children under the Department's care. *In re A.J.K.*, 116 S.W.3d 165, 169-70 (Tex. App.–Houston [14th Dist.] 2003, no pet.). The Texas Family Code requires an appellant seeking review of a subchapter E final order to file with the trial court, no later than fifteen days after the final order is signed, a statement of points on which the appellant intends to appeal. Act of May 22, 2001, 77th Leg., R.S., ch. 1090, § 9, 2001 Tex. Gen. Laws 2395, 2397-98 (current version at TEX. FAM. CODE ANN. § 263.405(b) (Vernon Supp. 2007)). Section 263.405 was enacted in 2001 to reduce postjudgment delays and screen out frivolous appeals. *See In re R.J.S.*, 219 S.W.3d 623, 625 (Tex. App.–Dallas 2007, pet. denied). An appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of points. TEX. FAM. CODE ANN. § 263.405(i) (Vernon Supp. 2007).

Kristina and Patrick did not include in their statement of points or their motion for new trial complaints about the trial court's determination that they engaged in Section 161.001(1) acts or omissions or the trial court's appointment of the Department as permanent managing conservator of the children. Accordingly, we cannot consider these contentions. *See id.*; *In re R.J.S.*, 219 S.W.3d at 625-26.

Kristina and Patrick complain that the trial court erred in refusing their request for additional findings of fact and conclusions of law. They do not elaborate on how it was error. Where an appellant complains on appeal that the trial court refused to make additional findings, but fails to apprise the appellate court of the significance of such findings and how they relate to some ultimate issue on appeal, the issue is waived. *Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 256 n.9 (Tex. App.–Houston [14th Dist.] 1999, pet. denied). However, because we are instructed to strictly scrutinize termination proceedings, we will consider the merits. *See Wiley*, 543 S.W.2d at 352.

Patrick and Kristina requested the trial court to make the additional finding of fact that, at the conclusion of the January 22 hearing, "the Court did not find sufficient evidence by clear and convincing evidence that termination" of their parental rights was in the best interest of the children. They also requested the trial court to state the additional conclusion of law that, at the conclusion of the January 22 hearing, "the Court did not order and decree that termination" of their parental rights was in the best interest of the children. In response, the trial court filed its additional findings of fact and conclusions of law, which we set out here in their entirety: "At the conclusion of the evidence on January 22, 2007, the Court, at the request of the Attorney Ad Litem for the children, adjourned the trial, and deferred its finding as to the best interest of the children, to a later date, April 27, 2007." Further, the trial court had found, in its findings of fact filed June 11, 2007, that on January 22, 2007, "a trial for termination of parental rights was heard" and the court found that the issue of best interest would be deferred until April 27, 2007. The trial court has no duty to make additional findings that are unnecessary to its judgment. *Vickery*, 5 S.W.3d at 254. It would be an unnecessary duplication for the trial court to also include in its findings a statement that it did not find sufficient evidence that termination was in the best interest of the children or include in its conclusions a statement that it did not decree that termination was in the best interest of the children.

We now consider whether the evidence is legally sufficient to support the trial court's finding that termination is in the children's best interest. The record shows that when the children were in their parents' care, they were found in an unsanitary apartment that did not have electricity or even a usable baby crib. The children themselves were dirty. A.T.S. was developmentally delayed, malnourished, had eight cavities, and was under the influence of cocaine.

More than a year before the termination, the court ordered each of the parents to pay $200.00 each month in child support. The record shows that neither parent paid any child support during the pendency of this case. Nearly a year after the children were taken away, after what was described as a transient lifestyle during which they did not always live together, Patrick and Kristina moved into a home they consider stable and set up a budget to meet their current needs. However, their work history is spotty and both spoke of changing jobs again. Moreover, they were not aware of how much would be needed for the children's expenses, and their budget did not include expenses for the children. The trial court could have concluded that Patrick and Kristina cannot meet the physical

18

needs of the children, did not adequately plan for the children, and cannot provide a stable home.

Although the family service plan's requirements were meant to provide the parents with the education and skills they needed in order to be good parents, Kristina and Patrick both failed to comply with the plan in many respects. Kristina and Patrick did not participate in face to face home visits with the caseworker, did not attend parenting classes specified in the plan, did not utilize agencies such as WIC and Medicaid to obtain community assistance for the well being of the children, and did not participate in classes for intense child development, nutrition, and age appropriate stimulation. Fifteen months after the children were removed from their home, Patrick and Kristina still lacked parenting skills. Their supervised visits with the children involved rough play and reprimands rather than nurturing. They did not have beds, clothing, or other items ready for the children's use. Other than relying on Baltieria, who already had a job working until 2:00 a.m., they had no firm plans for childcare. Therefore, the trial court could have concluded that Kristina and Patrick did not have the necessary abilities to be parents.

Moreover, there was no bond between Kristina and the children. A.T.S. was afraid of Patrick and M.D.S. did not remember Patrick. On the other hand, the children were doing well in foster care. M.D.S.'s foster mother wanted to adopt him. A.T.S. had improved in many ways while in foster care. For instance, he had become calmer and less aggressive since he began living away from his parents. Thus, the trial court could conclude that Kristina and Patrick were unable to meet the emotional needs of the children.

The evidence relating to the pertinent *Holley* factors, together with the parents' history of drug use and relatively short amount of time being drug free, is some evidence on which the trial court could have based a firm belief or conviction that termination would be in the children's best interest. Thus, the evidence is legally sufficient to support the trial court's determination that termination is in the best interest of the children. *See In re J.F.C.*, 96 S.W.3d at 266.

We turn now to Patrick and Kristina's factual sufficiency challenge. Patrick and Kristina presented evidence that they had a clean, safe home for their children, jobs, and a monthly budget based on current income and financial responsibilities. However, the Department pointed out that their living arrangements might not be stable because, unable to afford a place of their own, they would be sharing a rented home with two other adults, on whom they must depend and over whom

they had no control. One of their roommates had previously been involved with drugs. Further, Patrick testified that he intended to move his family to a different rent house when he was financially able. The Department characterized their living arrangements as "transient situations" that did not comply with the plan's requirement that they establish appropriate housing. Additionally, while each of them had a job, neither had a full time, permanent job with medical benefits. Neither Patrick nor Kristina had kept a job for very long, and their hours and rate of pay varied. Further, the reason they were in a living arrangement in which they shared a home was because they could not afford a home of their own. Neither Patrick nor Kristina was able to identify costs associated with raising children, and therefore those costs were not included in their monthly budget. While they had clearly made progress, a reasonable fact finder could have seen this as evidence of instability, reconciling this evidence in favor of its finding.

Similarly, the fact that both parents completed drug rehabilitation programs and had been drug free when tested is commendable. However, Patrick continued to use drugs for more than ten months after the Department took the children. According to his testimony at the final hearing, he had been drug free for less than five months. Although they attended NA or AA meetings, they missed about seven of the weekly meetings between the January hearing and the April hearing. Again, the trial court could have reconciled this evidence in favor of its finding.

Both parents admitted that they had an abusive relationship but, between the January and April hearings, they attended marriage counseling twice. While Patrick disputed Christian's characterization of his visits with his children, he admitted that they wrestled and A.T.S. might hit his mother. In light of the testimony of previous violence against Kristina and angry outbursts against employees of the Department, the trial court could have chosen not to believe Patrick's version of events or Kristina when she testified that Patrick did not get upset or raise his voice at home. The trial court could have reconciled this evidence with its determination that a home provided by Patrick and Kristina would be emotionally dangerous to the children.

The Department presented considerable evidence that Patrick and Kristina lacked parental abilities, a stable home, and the ability to meet the physical and emotional needs of the children. The conflicting evidence that might indicate otherwise is not so significant that a reasonable fact finder could not have formed a firm belief or conviction that terminating Kristina and Patrick's parental

rights would be in the children's best interest. Thus, the evidence is factually sufficient to support the trial court's finding. *See In re C.H.*, 89 S.W.3d at 25. Accordingly, we overrule Patrick and Kristina's first issue.

**HEARING OF APRIL 27**

In their second issue, Patrick and Kristina assert that the trial court erred because it held two termination trials. They argue that, while Section 263.401(b)(3) of the family code permits an extension of time to set a final hearing, the hearing of April 27 was actually a second trial that is not contemplated by the statute. They contend that the Department was improperly given a second opportunity to carry its burden of proof on the best interest question, which it had failed to do at the first hearing. In their third issue, Patrick and Kristina contend the trial court erred in terminating their parental rights because the burden of proof with respect to the January 30 order was vague in its application and placed an unreasonable burden of proof on them. They argue that the termination trial was on January 22, at which the Department did not meet its burden of proof, and then the burden of proof shifted to them to return to court on April 27 and show how they had complied with the January 30 order on the issue of best interest.

The Texas Family Code anticipates that suits in which the Department seeks termination of the parent child relationship shall be complete within one year after a temporary order appointing the Department as temporary managing conservator. *See* TEX. FAM. CODE ANN. § 263.401(a) (Vernon Supp. 2007). Section 263.401(b) authorizes the trial court to retain the case on its docket for an additional period not to exceed 180 days after that if the court finds that extraordinary circumstances necessitate the child's remaining in the temporary managing conservatorship of the Department and that continuing the appointment of the Department as temporary managing conservator is in the best interest of the children. Act of May 29, 2005, 79th Leg., R.S., Ch. 268, § 1.40, 2005 Tex. Gen. Laws 621, 636 (current version at TEX. FAM. CODE ANN. § 263.401(b) (Vernon Supp. 2007)).

On January 18, 2007, Patrick and Kristina filed a motion for extension of time pursuant to Section 263.401(b). They presented evidence on their motion at the January 22 hearing. The trial court carried the motion while hearing the Department's evidence. At the end of that hearing, the

21

trial court made findings regarding the acts and omissions itemized in Section 161.001(1) and granted the requested extension. Thus, Patrick and Kristina were given additional time to become fit parents. The Department did not request additional time and it was not given additional time to prove that termination is in the children's best interest. Patrick and Kristina misconstrue the trial court's actions.

Under the statutory scheme, once the Department is appointed temporary managing conservator, the parents are required to complete specified acts and refrain from certain specified acts before they are deemed fit to be parents. Kristina and Patrick requested an extension, and the trial court gave them an extension pursuant to Section 263.401(b). *See id*. At the April 27 hearing, the burden was still on the Department to prove that termination was in the children's best interest. *See In re D.M.C.*, 168 S.W.3d 319, 322 (Tex. App.–Texarkana 2005, no pet.) (Court distinguished between the state's evidentiary burden and mother's actions, as proven by the state, holding that mother failed to demonstrate that she met her burden as a parent, to provide the required protection and nurture the child.). One acceptable method of proving its case is to place the parents on the witness stand and ask them questions related to their abilities to parent and their resources, and to reveal their shortcomings and lack of resources. This is what the Department did. We overrule Kristina and Patrick's second and third issues.

## JANUARY 30 ORDER

In their fourth issue, Kristina and Patrick contend that the trial court erred in terminating their parental rights because the order of January 30, 2007 did not comply with the requirements of Section 263.401(b). They argue that the January 30 order is defective and not sufficient to extend the case because it does not expressly identify the "extraordinary circumstances" that required the children to remain in the temporary managing conservatorship of the Department. We disagree.

Section 263.401(b) authorizes the trial court to render an extension order in which it schedules the new dismissal date, makes further temporary orders for the safety and welfare of the child, and sets a final hearing before the dismissal date. Act of May 29, 2005, 79th Leg., R.S., Ch. 268, § 1.40, 2005 Tex. Gen. Laws 621, 636 (amended 2007). The statute does not require the court to explain in the order what the extraordinary circumstances are that necessitate the extension. The

22

order need not even be in writing. *See In re J.L.C.*, 194 S.W.3d 667, 672 (Tex. App.–Fort Worth 2006, no pet.). Further, a party who requests the trial court to reset the trial date beyond the original one year deadline has agreed to an extension under Section 263.401(b). *Id*. at 673. Moreover, a party who requests relief cannot complain on appeal if that relief is granted. *Id*. We overrule Kristina and Patrick's fourth issue.

**CONSTITUTIONALITY OF SECTION 263.405(i)**

In their fifth issue, Kristina and Patrick assert that Texas Family Code Section 263.405(i), in conjunction with subsection (b), is unconstitutional in its application. They contend that the statutory restriction against appellate review of any issue not specifically presented to the trial court in a timely statement of points violates their Fourteenth Amendment due process rights and their due course of law rights under the Texas Constitution. As an example, they complain that the fifteen day deadline for filing the statement of points requires them to address findings of fact and conclusions of law that have not yet been filed. They further assert that restricting "sufficiency of evidence" points to those that are "sufficiently specific" unfairly impedes them, arguing that if they cannot complain of the sufficiency of the evidence, their parental rights can be terminated without judicial review.

We must avoid constitutional decisions until the issues are presented with clarity, precision, and certainty. *See Rescue Army v. Mun. Court*, 331 U.S. 549, 576, 67 S. Ct. 1409, 1423, 91 L. Ed. 1666 (1947). Thus, we cannot decide abstract, hypothetical, or contingent questions. The subject matter jurisdiction of courts rests, in part, on the ripeness of the issues. *Patterson v. Planned Parenthood of Houston and Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998). Ripeness is one of several categories of justiciability. *See Perry v. Del Rio*, 66 S.W.3d 239, 249 (Tex. 2001). Justiciability requires a concrete injury, a requirement based on the judicial prohibition against issuing advisory opinions. *See Patterson*, 971 S.W.2d at 442-43.

As explained above, the family code forbids an appellate court from considering any issue that was not specifically presented to the trial court in a timely filed statement of points. *See* TEX. FAM. CODE ANN. § 263.405(i). Kristina and Patrick timely filed their statement of points for appeal attacking, among other things, the sufficiency of the evidence to support the trial court's finding that

23

termination is in the children's best interest. Because they identified the specific trial court finding they intended to attack on appeal, their statement of points is sufficiently specific as required by Section 263.405(i). *See In re S.K.A.*, 236 S.W.3d 875, 899-900 (Tex. App.–Texarkana 2007, pet. denied). Accordingly, their argument that the statute's requirement that sufficiency issues be sufficiently specific renders the statute unconstitutional is a hypothetical one in this case. We cannot declare a statute invalid based on a hypothetical possibility that the law may be unreasonable. *See United States v. Coastal Ref. & Mktg., Inc.*, 911 F.2d 1036, 1044 (5th Cir. 1990). Likewise, their general complaint that the statute's restrictions against appellate review of issues not included in the statement of points violates due process fails because it is not definite and concrete. *See In re J.J.*, No. 02-06-333-CV, 2008 Tex. App. LEXIS 1714, at *1 (Tex. App.–Fort Worth Mar. 6, 2008, pet. denied).

We turn now to their argument that Section 263.405(i) is unconstitutional because it requires them to address findings of fact and conclusions of law in the statement of points at a time when no findings or conclusions had been filed. In construing statutes, we ascertain and give effect to the legislature's intent as expressed by the language of the statute. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). We construe the statute's words according to their plain and common meaning, unless a contrary intention is apparent from the context. *Id*. at 625-26. However, we must not construe statutes in a way that would lead to an absurd result. *Utts v. Short*, 81 S.W.3d 822, 832 (Tex. 2002).

The family code dictates that the statement of points for appeal is due fifteen days after the final order of termination is signed. However, pursuant to the rules of civil procedure, the parents had until five days after their statement of points for appeal was due to file a request for findings of fact and conclusions of law. *See* TEX. R. CIV. P. 296. Once that request was filed, the court had twenty days to file its findings of fact and conclusions of law. *See* TEX. R. APP. P. 297. The parents' request for additional findings of fact and conclusions of law was due ten days after the court filed its original findings and conclusions. *See* TEX. R. CIV. P. 298. Therefore, a request for additional findings and conclusions could easily be timely under the rules of civil procedure although filed after the date the parents' statement of points was due. More than likely, application of these rules will result in findings and conclusions filed after the due date for the statement of points. To apply the

24

restrictive language in Section 263.405(i) in this instance would mean that the legislature did not intend for parents to appeal any alleged trial court error occurring after the date they filed their statement of points for appeal.  This construction of the statute leads to an absurd result.  *See **In re D.W.***, 249 S.W.3d 625, 643 (Tex. App.–Fort Worth 2008, pet. denied) (In the context of discussing how Section 263.405(i) is void as a violation of the separation of powers provision of the Texas Constitution, the court stated that Section 263.405(b) creates a duplicative procedural hurdle over and above the long established procedural rules for preservation of error.).  Because interpreting Section 263.405(i) to mean that Kristina and Patrick cannot complain of alleged errors involving findings of fact and conclusions of law filed or omitted after Section 263.405(b)'s deadline leads to an absurd result, we conclude that Section 263.405(i) does not apply to alleged errors occurring after the fifteen day deadline.  Therefore, Section 263.405(i) is not unconstitutional on this basis.  We overrule Kristina and Patrick's fifth issue.

## CONCLUSION

The evidence is legally and factually sufficient to support the trial court's order of termination of Kristina's and Patrick's parental rights.  The trial court did not hold two termination trials or improperly shift the burden of proof.  The January 30, 2007 order is not defective, and Patrick and Kristina did not show that Texas Family Code Section 263.405(i) is unconstitutional.

We ***affirm*** the trial court's order of termination of parental rights.


   SAM GRIFFITH
Justice


Opinion delivered July 31, 2008.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*


(PUBLISH)

25